In the Matter of the Construction of the Will of ABRAHAM S. ROSENTHAL, Deceased. JEAN L. TANBURN, Appellant; RHEA S. HOFFHEIMER et al., as Trustees under the Will of ABRAHAM S. ROSENTHAL, Deceased, et al., Respondents.

First Department, February 16, 1954.

*Joseph M. Proskauer* of counsel (*J. Alvin Van Bergh, Charles Looker* and *Philip J. Hirsch* with him on the brief; *Jack M. Ginsberg,* attorney), for appellant.

*P. Hodges Combier* of counsel (*Wendell P. Brown* and *Samuel A. Hirshowitz* with him on the brief; *Nathaniel L. Goldstein, Attorney-General*), respondent, in his statutory capacity under section 12 of Personal Property Law and section 113 of Real Property Law.

*Leo H. Hirsch, Jr.,* of counsel (*Boyle, Feller & Reeves,* attorneys), for Samuel R. Feller and another, as executors and nominated trustees under the will of Stephen A. Tanburn, deceased, respondents.

*Francis S. Bensel* of counsel (*Albert B. Maginnes, Leonard A. Blue* and *Douglas A. Witschieben* with him on the brief; *Kelley, Drye, Newhall & Maginnes,* attorneys), for Rhea S. Hoffheimer and others, as trustees under the will of Abraham S. Rosenthal, deceased, respondents.

BOTEIN, J. Petitioner appeals from a decree of the Surrogate construing the will of her great-grandfather.

That will divided the residue of the testator's estate into two equal parts, each to be held in trust for a term measured by two lives. It granted to petitioner's father (testator's grandson) the power to appoint by his own will the corpus of one of these trusts. In turn, by his will petitioner's father appointed the entire principal of the trust to petitioner. The donor of this power of appointment died in 1938 and the donee in 1952. Petitioner's interest in the principal of the trust has not vested, as the remaining life tenant is alive.

The construction sought is whether petitioner would forfeit her right to take under the appointment were she, contrary to a provision in the donor's will, to marry someone '' who was not born in the Jewish faith and who shall not be of Jewish blood ''. She contemplates marrying a man named Kelley — concededly not of the Jewish faith. The learned Surrogate has ruled that if she marries outside the Jewish faith, she will forfeit her right to take as an appointee under her father's will.

There can be no doubt that the donor held strong views about intermarriage and that these views found expression in sweeping strictures prohibiting *certain* offending descendants or their spouses from taking under his will. The pertinent provisions of the will which, it is claimed, must disqualify petitioner should she marry Kelley, are found in Article Twelfth, and read as follows:

'' Twelfth: Anything herein contained to the contrary notwithstanding, all legacies and devises and all powers of appointment or disposition under this my Last Will and Testament, given, devised and bequeathed to any child of mine or to any descendant of mine, are given, devised and bequeathed subject to the following express condition, that is to say: In case any child or descendant of mine shall at the time of my death be married or shall thereafter marry, and the spouse of such child

or descendant of mine shall be a person who was not born in the Jewish faith and who shall not be of Jewish blood, then upon my death if such marriage shall have occurred prior thereto, or if such marriage shall occur after my death then upon such marriage, all legacies and devises whether of income or of principal to such child or descendant of mine so marrying, and all powers of appointment or of disposition given, devised and bequeathed to such child or descendant of mine so marrying, shall be cancelled, annulled and revoked and such legacies and/or devises whether of principal or income shall upon my death if such marriage shall occur prior to my death, or upon such marriage if such marriage shall have occurred after my death, be disposed of as though such child or descendant of mine had died before me if such marriage shall have occurred prior to my death, or had died at the time of such marriage if such marriage shall occur after my death, without power to appoint or dispose of any of the income or principal of my estate ''.

It will be noted that the donor cancelled all legacies, devises and powers of appointment given to his descendants who married outside the Jewish faith; but conspicuously absent, when compared with other directions in this long and carefully drawn will, is any disqualification of appointees, such as petitioner. The above-quoted portion of the will contains the only provisions which it is claimed expressly proscribe petitioner from taking by appointment. Concededly petitioner's father never forfeited his power of appointment.

The first contention of respondent trustees, it would appear, is that as matter of law the petitioner-appointee is a legatee or devisee and therefore expressly disqualified by the above-quoted provisions of the will.

It is true that in far different settings interests passing by testamentary appointment have been endowed with the characteristics of estates created by the original will, or for reasons of public policy have been held to be tantamount to such estates. Thus, there is no doubt that the donee was the agent of the donor to effectuate the latter's testamentary purposes and to that end we must read both their wills as one instrument (*Matter of Walbridge,* 178 Misc. 32, 37). Also, in exercising his power of appointment the donee was disposing of the donor's property, and it remains the donor's property, until vested in someone else (*Matter of Harbeck,* 161 N. Y. 211; *Farmers' Loan & Trust Co.* v. *Mortimer,* 219 N. Y. 290).

These propositions find expression in those cases which enunciate the principle that for the purpose of ascertaining

whether the Rule against Perpetuities has been violated, interests resulting from the exercise of a power of appointment will be measured from the date of creation of said power of appointment (*Genet* v. *Hunt,* 113 N. Y. 158; *Fargo* v. *Squiers,* 154 N. Y. 250; *Farmers' Loan & Trust Co.* v. *Kip,* 192 N. Y. 266; *Guaranty Trust Co.* v. *Halsted,* 245 N. Y. 447). When a testator adopts the device of giving the second life in being the power further to tie up the estate, the courts have held that the estate thus created through exercise of the power of appointment should be treated as if it were an estate created by the original testator. However, it is one thing to implement public policy and develop a liaison between donor and donee based upon the premise that the donee is disposing of the donor's property. That premise is clearly valid, but has no bearing on the construction problem posed here. The fiction of "relation back" cannot be stretched to constitute authority for the proposition that in this proceeding petitioner's interest through appointment must be adjudged a legacy or devise.

Therefore, we cannot find that the clearly expressed purpose of the donor to exclude any of his descendants who should marry a non-Jew from taking by *legacy* or *devise,* or from exercising a power of appointment under his will necessarily disqualifies this petitioner. We must, however, examine the entire will to determine whether it was an inadvertence in drafting the instrument that accounts for the failure expressly to include appointees among the disobedient descendants whom the donor desired to cut out of his will; or whether the donor intended the words "legacy" and "devise" to embrace an appointment such as was made to petitioner. "When the intention is ascertained, the mode of expression, or an inadvertent omission in some particular, should be subordinated to the intent without regard to technical objections if in harmony with the general scheme and purpose of the will. The primary effort should be to find the testatrix's general scheme and carry her purpose into effect, to which even general rules of interpretation are subservient" (*Williams* v. *Jones,* 166 N. Y. 522, 533).

The high degree of skill and the painstaking care manifested in the drawing of this will are factors militating against a finding of an inadvertent omission. This was a long and comprehensive document, establishing two trusts, making many bequests, and purporting to dispose of well over $1,000,000. Wherever a similar provision was made for different persons or classes of persons, or where provision was made for the same

people from different trusts, the language employed was identical, to the commas. Or, where different bequests partially parallel each other, again the language was identical up to the point of departure. This would indicate a craftsmanlike method of cross checking.

Because of the draftsman's competency, the language of the second disqualifying provision in Article Twelfth — the clause immediately following the one which respondents claim disqualified petitioner — takes on added significance. It reads as follows: " and provided further that any husband and/or wife, who shall not have been born in the Jewish faith and who shall not be of Jewish blood, of any such child or descendant of mine and any descendant of mine who shall not have been born in the Jewish faith and who shall not be of Jewish blood shall not be entitled to take any share or interest in the principal and/or income of my estate either as legatee, devisee, *appointee,* heir at law or next of kin, distributee or otherwise ". (Emphasis supplied.) The prohibition contained in this provision is directed at non-Jewish spouses and non-Jewish descendants, as contrasted with the preceding provision, which is directed at Jewish descendants who marry non-Jews — as petitioner contemplates doing. Because of the juxtaposition of these clauses, the use of the word " appointee " in one and its omission in the other stand out starkly and argue against inadvertence.

Furthermore, to distill from the first part of Article Twelfth a testamentary intent to disqualify Jewish descendants from taking any interest as appointees, we must supply through inference substantially the same language that clearly and unequivocally, in the second part of the same article, disqualifies non-Jewish spouses and non-Jewish descendants. Where different classes of persons are thus interdicted from taking similar interests, rudimentary draftsmanship would indicate that all such persons be joined in the same disqualifying clause. Also, when giving his grandson the testamentary power of appointment in subdivision (5) of Part I of Article Eighth, the donor neither mentioned nor made reference to any limitation attaching to that power of appointment. It is not uncommon practice to mesh such limitations or conditions into the same clause that creates the power.

When the testator sought to disqualify someone as an appointee, he was not at a loss for language clearly effecting such disqualification. For, in Article Thirteenth he specifically cut off six named persons — not including petitioner — from sharing in his estate, and he went on to say: " and wherever

in this my Last Will and Testament a power of appointment is granted to any persons, such power is hereby expressly limited to the appointment to persons other than those herein mentioned as being   *  *  *   expressly excluded from any share in my estate.''

In order to disqualify petitioner we must in effect rewrite the donor's will so as to couple the word '' appointee '' with the legatees and devisees who are expressly excluded under the first clause of Article Twelfth. Sometimes the purpose and intent of a testator, read in the context of the entire will, burst the technical barriers of precise verbiage and are revealed so clearly as to justify judicial retouching. A careful reading of this will opens up interesting trails of surmise as to the donor's overall purpose, but they fork off into bypaths of sheer speculation. The more reasonable inferences, if anything, indicate that the donor knowingly refrained from extending the ban of his displeasure to the appointees of his grandson.

For example, the donor divided the bulk of his estate into two parts, giving a life tenancy in one to petitioner's father and a life tenancy in another to a second grandson. He did not give the other grandson a power of appointment, as he gave to petitioner's father, and the former's descendants, if any, would take under the will with the attendant possibilities of disqualification. It could be argued that it is unnatural for a testator so to prefer one line of descendants over another. On the other hand, there are hints of a history culminating in a revealing provision contained in Article Fifteenth: '' Fifteenth: I have made more provision for my grandson, Stephen A. Tanburn, and his descendants under the terms and provisions of this Will than I have for my grandson, Alfred S. Meyer, and his *descendants,* only after long and serious deliberation and because of reasons which I deem good and sufficient and not because of any lack of love and affection I bear to my said grandson, Alfred S. Meyer.'' (Emphasis supplied.)

The degree of confidence reposed in petitioner's father is further evidenced by the fact that the sole limitation on the exercise of the power of appointment given to him related to the exclusion of certain named individuals, non-Jewish descendants and non-Jewish spouses of descendants. Beyond this he was free to appoint to whomever he chose. One could well conclude, as did Surrogate DELEHANTY in *Matter of Salomon* (156 Misc. 445, 443), that: '' testator understood the distinction between his own explicit directions written in the will and the

act of his donee ''; '' Testator may well have been satisfied to rely upon the judgment and discretion of any child of his who had observed his wishes respecting marriage. There is no reason why the court should read into the power of appointment a prohibition broader than the terms used by testator. Testator intended that no ' direction ' of *his* should operate to vest his property in issue of a disobedient child or descendant. But he did not so limit the beneficiaries of an appointment.''

While it has been held that '' Conditions in partial restraint of marriage, which merely impose reasonable restrictions upon marriage, are not against public policy.'' (*Matter of Liberman,* 279 N. Y. 458, 464), certainly there is not involved herein any affirmative public policy which would impel us to strain to fashion a testamentary intent from such muddled and speculative ingredients.

Accordingly, the decree of the Surrogate is reversed and Article Twelfth of the will is held inapplicable to petitioner's interest as appointee thereunder. In view of the foregoing, it follows that the petitioner has not made any claim against the validity of any provision of the will. Therefore, we also hold that Article Eighteenth of the will is inapplicable and allowances and costs should not be charged against petitioner.

BREITEL, J. (dissenting). The pertinent facts and applicable rules of law have been most fairly and admirably stated in the majority opinion; but I cannot agree with the reasoning or the result reached.

Concededly testator had the power to exclude petitioner from benefiting from his estate if she married outside testator's religion. The suggestion tendered by petitioner on this appeal that such an exclusion violates public policy has evidently been rejected by the majority, as it must be in the light of the authorities, which constrain us. (*Matter of Liberman,* 279 N. Y. 458, 464; *Matter of Seaman,* 218 N. Y. 77, 81.)

Concededly testator '' held strong views about intermarriage and * * * these views found expression in sweeping strictures prohibiting *certain* offending descendants or their spouses from taking under his will.'' (Majority opinion, *ante,* p. 318.)

Concededly the will was drawn by competent craftsmen who were unlikely to have been responsible for inadvertent omission.

Concededly the only authorities that bear on the question, for whatever purpose, regard appointees who take under a power of appointment as taking under the will of the donor of

the power, in this case the will of the great-grandfather. The will provided that no devisee or legatee might intermarry except at the expense of losing the legacy or devise to which he might be entitled. All this, we may presume, was within the knowledge of the competent craftsmen retained by testator to draw his will.

Yet the majority would construe the will herein strictly against the testator, contrary to his evident intention, and on the narrow limitation of language to particular paragraphs, although among lawyers the language would be inter-related between the paragraphs in question. This is applying a policy and a technique to a will that we reserve for lengthy contracts tendered by a strong bargaining party to a weaker bargaining party, as we may in the case of the insurance policy or the apartment lease. Then, because the weaker of the parties has no effective voice in suggestions for amendments to the agreement tendered, the law protects him by a policy of strict construction, which may indeed frustrate the intention of the draftsman, although not that of the other party to the transaction. That is not a rule or a policy that we may or should apply to wills.

The effect of the decision by the majority in this case, I submit, is to frustrate the testator's intention, to apply a never-before-used strict construction to a will, and in fact to ignore that the will was drawn by competent lawyers who by no speculation should be considered to have used language except in the manner in which it had been used in instruments in the past and in the decided cases.

Accordingly, I would hold that the Twelfth paragraph in referring to legacies and devises was referring to those that were created by the exercise of the powers of appointment granted in the will. I would also hold that the further reference to powers of appointment in that paragraph was required in order to make clear that powers, as distinguished from substantive bequests and devises, also could not pass to those who were not of testator's faith or who married outside testator's faith.

The decree should be affirmed.

CALLAHAN and BERGAN, JJ., concur with BOTEIN, J.; BREITEL, J., dissents and votes to affirm, in opinion; DORE, J. P., dissents in the following memorandum: For the reasons stated in the opinion of the learned Surrogate, I vote to affirm.

Decree reversed in accordance with the opinion herein, with costs to the appellant.

Republished decision, February 17, 1954.

Decree reversed in accordance with the opinion herein, with costs to the appellant. The order of this court, entered February 16, 1954, hereby is vacated. Order filed.█

Present — DORE, J. P., CALLAHAN, BREITEL, BOTEIN and BERGAN, JJ.